Argued and submitted January 27 at University of Oregon, Eugene, affirmed April 13, 2011

Dixie L. TAYLOR,
Personal Representative for the
Estate of Irma J. Taylor, Deceased,
*Plaintiff-Respondent,*

*v.*

PORTLAND ADVENTIST MEDICAL CENTER,
an Oregon corporation,
*Defendant-Respondent,*

*and*

Gregory ROBINSON, M. D.
and Mark R. Anderson, M. D.,
*Appellants.*

Multnomah County Circuit Court
070505420; A142219

255 P3d 526

Rachel Woods Arnold argued the cause for appellant Gregory E. Robinson, M. D. On the opening brief were Paul Silver and Lindsay Hart Neil Weigler. With them on the reply brief was Rachel Woods Arnold.

Lindsey H. Hughes argued the cause for appellant Mark R. Anderson, M. D. With her on the opening brief were Susan Mahoney and Keating Jones Hughes PC. On the reply brief were Lindsey H. Hughes and Keating Jones Hughes PC.

Maureen Leonard argued the cause for respondent Dixie L. Taylor. With her on the briefs was Robert Beatty-Walters.

Janet M. Schroer argued the cause and filed the brief for respondent Portland Adventist Medical Center.

Before Schuman, Presiding Judge, and Brewer, Chief Judge, and Duncan, Judge.

BREWER, C. J.

**BREWER, C. J.**

Appellants, who are two physicians employed by defendant Portland Adventist Medical Center, appeal from separate orders denying their motions to intervene in this action for medical malpractice resulting in wrongful death, in which plaintiff, the personal representative of her mother's estate, sought damages against defendant hospital based on the alleged negligence of the physicians. We review the trial court rulings on the physicians' motions for permissive intervention under ORCP 33 C for the proper exercise of discretion. *See Samuels v. Hubbard*, 71 Or App 481, 692 P2d 700 (1984), *rev den*, 299 Or 118 (1985). We affirm.

Plaintiff is the personal representative for the estate of her mother, Irma Taylor. Irma Taylor died after having been seen, treated, and sent home by appellant Dr. Mark Anderson, an emergency department physician, at the emergency room of defendant's hospital. Plaintiff filed a complaint against defendant in this action on May 14, 2007. In her complaint, plaintiff alleged that defendant was negligent because of acts and omissions of its employee or agent, Anderson, in failing to diagnose and treat the decedent's acute infection. In particular, plaintiff alleged that Anderson had evaluated the decedent in the emergency room and that the decedent had a fever and was suffering from myelodysplastic syndrome, "which increased her risk of infection." Plaintiff alleged that Anderson discharged the decedent later that evening with a diagnosis of acute febrile illness, and the next morning the decedent was found unresponsive in her home and was ultimately pronounced dead. Plaintiff did not join Anderson or any other person or entity besides defendant as a party to the action.

Defendant filed an answer in the action in which it denied plaintiff's allegations of negligence. However, defendant did not file a third-party complaint against Anderson or take any other steps to join any additional party in the action. Trial initially was set in the case for June 14, 2008. The parties later stipulated to a set-over of the trial date to January 2009.

Plaintiff deposed Anderson on January 21, 2008. During that deposition, plaintiff learned for the first time the

extent to which Anderson had consulted with appellant Dr. Gregory Robinson, the decedent's primary care physician, and that Anderson believed that he and Robinson had made a joint treatment decision about the decedent's care, including her discharge from the emergency room. In September 2008, defendant tendered the defense of the action to Anderson, and Anderson's attorney was substituted as counsel for defendant.

On September 16, 2008, plaintiff deposed Robinson and questioned him about his consultation with Anderson. Robinson acknowledged that he had consulted with Anderson about the decedent's condition and treatment. Robinson testified that he had agreed with Anderson's decision to send the decedent home from the emergency room, but Robinson disagreed with Anderson's deposition testimony that the physicians had made a joint discharge decision. On November 11, 2008, plaintiff's counsel notified Robinson's attorney that she was considering adding Robinson as a named defendant. However, plaintiff's counsel later learned that Robinson, like Anderson, was an employee of defendant.

On December 18, 2008, plaintiff filed and served an amended complaint that added allegations of defendant's negligence for the acts or omissions of its employee or agent, Robinson. The amended complaint alleged that "Dr. Anderson and Dr. Robinson together and in concert" negligently misdiagnosed the decedent's condition and "together negligently determined" that she should be discharged from the hospital. All told, the amended complaint included six specifications of negligence, each of which alleged that the two physicians acted "together" or "in concert." After plaintiff filed the amended complaint, trial was reset for May 26, 2009.

In February 2009, defendant filed its answer to the amended complaint, in which it admitted that the two physicians were its employees acting within the course and scope of their employment.[1] Also in February 2009, defendant's

---

[1] The trial court ultimately entered partial summary judgment for plaintiff, ruling that Anderson and Robinson were employees or agents of defendant acting within the course and scope of their employment or agency when they treated the decedent.

own attorney was resubstituted, in place of Anderson's attorney, as counsel for defendant in the action.

On February 16, 2009, Robinson filed a motion to intervene in the action, and, on February 17, Anderson also filed a motion to intervene. In those motions, the physicians argued that a judgment against defendant could have an adverse effect on their professional licenses, credentials, and malpractice insurance coverage, in part, because of a perceived duty on defendant's part to report adverse medical malpractice judgments under federal and state law. In particular, the physicians argued that an adverse verdict would require defendant to issue reports to the National Practitioner Data Bank, 42 USC § 11131 (requiring reports on medical malpractice payments), and the Oregon Medical Board (ORS 742.400(2)(a); ORS 742.400(4)), which, in turn, could trigger an investigation by that board. In addition, they asserted that their interests were in potential conflict with defendant's interests and that their interests also were in potential conflict with each other. The physicians also argued that their absence as parties might expose them to greater vulnerability to a later indemnity claim by defendant. In particular, they asserted that their employment agreements with defendant required them to fully "cooperate in good faith, using their best efforts" to defend any claims made.

In response, plaintiff argued that there was no conflict between or among defendant and the physicians, that any judgment against defendant would not have a direct adverse effect on the physicians, and that, to plaintiff's prejudice, the physicians had unduly delayed seeking intervention. Plaintiff also argued that she was permitted by law to choose to sue a vicariously liable defendant alone and should not be forced to sue the employees as well. As plaintiff saw things, intervention would give defendant and the physicians "three shots at my experts, three sets of experts," and extended opening statements.

On March 17, Judge Kantor held a hearing on the physicians' motions to intervene. At the hearing, the court engaged in the following colloquy with defendant's counsel about why defendant had not filed a third-party complaint for indemnity against the physicians:

"THE COURT: Tell me why it doesn't—while other—the idea of third-party for indemnity, which is a common practice in all kinds of litigation, why that doesn't solve all the concerns except [defendant's] worry that doctors are going to be upset, that the word's going to get out that [defendant] sues doctors.

"[DEFENDANT'S COUNSEL]: Well, I would tell Your Honor that's extremely significant."

Defendant's attorney explained that defendant and the physicians had made the deliberate decision that defendant would not sue the physicians for indemnity; instead, the physicians would seek to intervene and, by some method, resolve indemnity issues at the same time.

In its letter opinion denying the physicians' motions to intervene, the trial court stated:

"Although I could imagine a scenario which would support allowing intervention by a treating doctor into a medical negligence case against a hospital, probably more in the nature of a 'conditional' intervention, the circumstances of this case do not support that conclusion. I agree with [plaintiff] on most of the legal and factual issues. While I think that this case is stronger for the defense and doctors than in *Kissoon v. Araujo*, 849 S2d 426 (Fla App 2003), that case still supports the plaintiff's position here, especially as the 'threat' of indemnity is one which the parties to the contract created for themselves. But even if I agreed more with the defense on some of the issues, these motions were filed too late in the game. For all of these reasons, the motions are denied."

On April 21, 2009, Judge Kantor entered a written order denying the physicians' motions to intervene.

On April 22, 2009, the case was assigned to Judge Bloch for trial. Robinson then filed a renewed motion to intervene, reasserting the arguments that he had asserted in his first motion to intervene.[2] On May 5, defendant filed a written submission joining Robinson's motion to intervene. At

---

[2] Although Anderson did not file a separate second written motion to intervene, his counsel participated in oral argument on Robinson's motion, and Anderson filed a reply brief in support of Robinson's motion. In light of our disposition of this appeal, it is unnecessary to consider whether Anderson himself actually made a second qualifying motion to intervene in the action.

oral argument on the motion, defendant's counsel argued that defendant intended to file a "third-party complaint or file a subsequent complaint against" the two physicians. The trial court pressed defendant's counsel about the nature of the asserted conflict between and among defendant's and the physicians' litigation positions. Defendant's counsel explained that a conflict existed because defendant would want the jury in this case to allocate fault between the two physicians in order to obviate the need for a subsequent indemnity action.

In particular, defendant's counsel stated:

"So I have—I'm thinking now if I'm going to try this case as the only defense lawyer or the only defendant, being the hospital, how can I reconcile those two direct conflicts of testimony because they—they bear directly on the liability. If Dr. Robinson did not participate in the decision to discharge this patient, he has no liability, but—but if he did and there's—there's fault for—discharging her, then he does. So there's a direct conflict between Dr. Anderson and Dr. Robinson on whether they acted together or not.

"And—and the potential for one to win and one to lose is—is obvious. That's going to bear on the indemnity issue later. It's going to enter on settlement talks with them later. It's—I don't know how to resolve it on—on my own.

"* * * * *

"It presents a direct conflict for me in deciding which of those horses to ride. I cannot—I cannot reconcile those conflicts—conflicts of testimony in any way that—that comes out of this trial on an equal basis.

"So by not allowing the motion to intervene, we are building in probably an inability to settle the case, and—and if there's a plaintiff's verdict, we are building in another lawsuit, and that can be avoided.

"* * * * *

"But if there's a plaintiff's verdict, what I'm saying is that it automatically falls from that that there is an indemnity lawsuit against the two doctors because we cannot establish their percentage of fault.

"* * * * *

"[A]t the primary trial because I can't argue in favor of one and against other. It just—it just can't—can't work that way. And—and I think the disciplinary rules prohibit me, and I think it's Oregon Rules of Professional Conduct 1.7: A lawyer shall not represent a client if the representation involves a current conflict of interest. A current conflict of interest exists if the representation of one client will be directly adverse to another client; or 2, if there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibility to another client."

Plaintiff replied that, based on the existing pleadings in the action—with or without the physicians' intervention—there could be no apportionment of liability or fault between the physicians. Plaintiff also argued that the problem defendant sought to obviate could have been avoided by the timely filing of a third-party action against the physicians under ORCP 22 C(1).

■  The trial court orally denied Robinson's motion, explaining that,

"[s]o with respect to the motions to intervene, I do believe that they are sufficient evidence of a—of an indemnity, indemnitable relationship exist—existing between the physicians and [defendant] to support there being a * * * legal interest of a sufficient nature and a sufficiently direct impact under the [*Barendrecht v. Clark*, 244 Or 524, 419 P2d 603 (1966),] case.

"I also believe that there is some evidence that—that there is a reporting requirement that will—that seems likely to be triggered here since a reporting entity is a physician, and in this instance, it isn't a physician's conduct that is at issue here. However, I do not find under these circumstances that it is appropriate for me to exercise my discretion to allow intervention because I do not believe that the physicians' interests are not adequately represented by the existing defendant.

"I find that those interests relative to the issues presented in this case on the current state of the pleadings to be in perfect alignment, that being [defendant] wins this case only to the extent that—that both physicians' conduct is found to have met the standard of care, and that is certainly in the interests of either and both physicians to make

that same case. So I'm—for that reason, I'm going to deny the motions to intervene."

On May 15, 2009, Judge Bloch entered written orders denying the renewed motions to intervene. On May 19 and 20, 2009, the physicians timely appealed from the two separate trial court orders denying their motions to intervene.[3] The trial court abated the proceedings before it pending this appeal.

"Intervention takes place when a third person is permitted to become a party to an action between other persons," by joining the plaintiff's claims, by uniting with the defendant to resist the plaintiff, or by demanding something adverse to both the plaintiff and the defendant. ORCP 33 A. ORCP 33 further provides, in relevant part:

> "B   At any time before trial, any person shall be permitted to intervene in an action when a statute of this state, these rules, or the common law, confers an unconditional right to intervene.
>
> "C   At any time before trial, any person who has an interest in the matter in litigation may, by leave of court, intervene. In exercising its discretion, the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties."

As we said in *Samuels*,

> "ORCP 33 is the first clear recognition in Oregon of a distinction between intervention of right and permissive intervention. Some cases considering intervention under *former* ORS 13.130 (*repealed* by Or Laws 1979, ch 284, § 199) suggested that a party that met the requirements of that statute had a right to intervene. *See Barendrecht v. Clark*, 244 Or 524, 528, 419 P2d 603 (1966); *Duke v. Franklin*, 177 Or 297, 304-05, 162 P2d 141 (1945). The present rule, however, clearly limits intervention of right to the few circumstances described in ORCP 33 B. We review decisions on motions based on those circumstances as matters of law. Other motions for intervention must meet the requirements of ORCP 33C and, even if they do, the trial court has discretion whether to grant them. We review these latter

---

[3] An order denying a motion to intervene is appealable immediately. ORS 19.205(2); *Samuels*, 71 Or App at 484-85.

decisions only to determine whether they are within the court's discretion."

71 Or App at 485-86.

In this case, defendant and the physicians acknowledge that intervention was not authorized as a matter of right under ORCP 33 B; instead, the physicians sought permissive intervention under ORCP 33 C. Accordingly, the first question is whether the physicians' motions met the requirements of ORCP 33 C. If so, we consider whether the trial court properly exercised its discretion in denying the motions. *Id.* We begin with the physicians' challenge to the May 15 orders denying the renewed motion for intervention because, as we will explain, those rulings reflected a proper exercise of discretion which obviates the need to address the earlier rulings embodied in the April orders concerting the initial motions to intervene.

■ The threshold question is whether the physicians "ha[ve] an interest in the matter in litigation." ORCP 33 C. Defendant and the physicians argue, based on other provisions of the Oregon Rules of Civil Procedure and decisions from other jurisdictions, that ORCP 33 C should be liberally construed in favor of intervention. That argument overstates the case for permissive intervention under Oregon law. As we held in *Samuels*, in that respect, ORCP 33 is consistent with case law construing its predecessor statute, ORS 13.130:

> "Those bases were strict. '[T]he right or interest which will allow a third person to intervene must be of such a direct and immediate character that the intervenor will either gain or lose by the direct legal operation of the judgment[.]' *Brune v. McDonald*, 158 Or 364, 370, 75 P2d 10 (1938)."

71 Or App at 488 n 4. Of course, that formulation, however strict, is not self-defining. In fact, the parties differ at length about whether various of the physicians' posited interests qualify for permissive intervention. However, at the outset it is important to clarify how an adverse judgment against defendant in this case would *not* affect a direct and immediate interest of the physicians. As plaintiff, defendant, and the physicians acknowledge, if the physicians are not parties to this action, any judgment against defendant would have no preclusive effect against the physicians. That is so because

the physicians can neither control the defense of this action—as noted above, defendant's own attorney was resubstituted as counsel for defendant in 2009—nor has defendant undertaken to represent their interests in the action.[4] Accordingly, should defendant later bring an action against the physicians for indemnity, the physicians would be free to argue that they were not negligent at all in providing care and treatment to the decedent in this case. Moreover, the physicians could fully litigate, by means of cross-claims, whether and the extent to which either or both of them were at fault. Thus, in the most classic sense, without their permissive intervention, the physicians would suffer no direct and immediate economic effect from an adverse judgment at all.

For assistance in sorting out the legal sufficiency of the interests that the physicians do posit, we turn to previous cases. In *Samuels*, the plaintiff filed an action against L. Ron Hubbard alleging that Hubbard had committed various torts against the plaintiff through Hubbard's direction and control of the Church of Scientology of California, Inc., and the Church of Scientology, Mission of Davis. Hubbard did not appear in the case to defend the action, but the Church of Scientology of California and the Church of Scientology, Mission of Davis, moved to intervene as defendants. The trial court denied those motions, and the two churches appealed. In addressing the churches' arguments under ORCP 33 C, we considered purported interests that were similar to interests that the physicians advance in this case. First, we considered the churches' argument that the disposition of the case in

---

[4] For either claim preclusion or issue preclusion to apply, the person against whom preclusion is asserted must have been a party or in privity with a party to the earlier proceeding. *Bloomfield v. Weakland*, 339 Or 504, 510-11, 123 P3d 275 (2005) (claim preclusion); *Nelson v. Emerald People's Utility Dist.*, 318 Or 99, 104, 862 P2d 1293 (1993) (issue preclusion). The Supreme Court has emphasized the role of fundamental fairness in privity questions:

"As this court stated in *Wolff v. Du Puis*, 233 Or 317, 321, 378 P2d 707 (1963), 'privity' is merely a word used to say that the relationship between the one who is a party on the record and another is close enough to include the other within the res judicata.' *Id.* at 322."

*Bloomfield*, 339 Or at 511. Privity "includes those who control an action although not parties to it; those whose interests are represented by a party to the action; and successors in interest to those having derivative claims." *Wolff*, 233 Or at 322 (citing *Restatement of Judgments* § 83 (1942)).

their absence might, as a practical matter, impede their ability to protect their religious and reputational interests. We stated:

> "Assuming that those concerns give intervenors an 'interest in the matter in litigation,' they are not significant enough that the trial court's action was outside its discretion. Although there may be extensive litigation between various Scientology organizations and their opponents, we do not see how the exclusion of intervenors from this case would damage their interests in others. There would be no *res judicata* as to them. Despite their arguments to the contrary, there would also be no *stare decisis* effect. The effect of a judgment against Hubbard on intervenors' reputation is highly speculative."

*Samuels*, 71 Or App at 488.

In this case, the physicians posit reputational and related economic risks from a judgment adverse to defendant in this case, that if imminent and probable would be more concrete and less speculative than the interests that the churches advanced in *Samuels*. The difficulty is that each of those risks is sharply disputed and difficult to accurately weigh in our calculus, in part, because they would not flow directly from the operation of such an adverse judgment, but would require additional action by defendant and third parties that may or may not occur, at least in the absence of an adjudication of negligence that is binding on the physicians.

In that regard, a decision of the Florida Court of Appeals provides a useful analogy. In *Kissoon v. Araujo*, 849 So 2d 426 (Fla Dist Ct App 2003), the plaintiff had sued the defendant doctors for wrongful death. *Id.* at 428. In one of the defendants' expert's depositions, the expert alleged that Kissoon, who was not a named defendant, was actually the legal cause of the decedent's death. *Id.* Kissoon sought to intervene in the action, alleging that the comments "could potentially have a devastating effect on his reputation, subject him to professional investigation by the Florida Board of Medicine, and hinder the practice of medicine at the children's hospitals where he provides treatment." *Id.* at 429. The trial court denied the motion based on its conclusion that

any effect on Kissoon would not be a direct result of the judgment. *Id.* at 428.

The Florida District Court of Appeals agreed, noting that any judgment in favor of the plaintiff would not automatically result in an investigation by the board or impose any liability on Kissoon. *Id.* at 429. The court explained that it was possible that a verdict for the plaintiff could be supported by a reason other than Kissoon's alleged negligence. The court also stated that, even if administrative proceedings were initiated against Kissoon, he would have a forum in which to address the allegations made against him, and the judgment in the wrongful death action would have no impact on that proceeding. *Id.* at 430 n 3.

Admittedly, here, unlike in *Kissoon*, the physicians are named in the body of the amended complaint and, as framed by the pleadings, any judgment adverse to defendant would necessarily derive from a jury's determination that the physicians were negligent. However, here, as in *Kissoon*, it is far from clear that a judgment entered solely against defendant, even though based on malpractice allegations against the physicians, would automatically result in a report to either a federal or state review body that would have a direct adverse effect on the physicians' malpractice coverage or rates or their medical licenses or credentials.[5] Moreover, as in *Kissoon*, it is not at all certain that, even if any such adverse action were initiated, the physicians would be denied an opportunity to fully defend themselves by asserting in the pertinent forum or proceeding that they were not, in fact, negligent. Accordingly, we cannot conclude, based on the record before us that the physicians' posited reputational,

---

[5] For example, indeed, quite understandably, the physicians' malpractice reporting concerns relate to the risk that defendant would report, under 42 USC § 11101, *et seq.* of the Health Care Quality Improvement Act of 1986, any malpractice payment that it made resulting from a settlement or judgment in this case, as a payment made "for the benefit of" the physicians. *See* 45 CFR §§ 60.5(a), 60.7. Such a report, in turn, would require a report to the physicians' state medical board. 42 USC § 11134(c). However, it is not clear that any judgment against defendant in this action would result in a payment "for the benefit of" the physicians. As the physicians note, such reports could occur: "A physician has no control over any entity's decision to report, and any recourse for an erroneous report is limited, and potentially extremely costly." The difficulty is that such incidental and contingent possibilities arising from an adverse judgment against defendant do not satisfy the test for a qualifying permissive intervention interest under ORCP 33 C.

licensing, credentialing, and insurance interests would be immediately and directly affected by the operation of a judgment against defendant in this case.

■    We turn to the physicians' assertion that their indemnity obligations to defendant are a qualifying interest under ORCP 33 C. As discussed, the record shows that, under the terms of their employment agreements, the physicians owe defendant a duty to fully "cooperate in good faith, using their best efforts," to defend any claims made. Moreover, even in the absence of a contractual duty, the physicians would have a common-law duty to indemnify defendant if it is held vicariously liable, without negligence on its own part, for the physicians' negligence. *Fireman's Fd. Am. Ins. Cos. v. Turner*, 260 Or 30, 34, 488 P2d 429 (1971). Oregon courts have consistently held that such an interest qualifies as a lawful basis for permissive intervention.

In *Samuels*, for example, we said:

> "Intervenors' strongest argument is that their position as Hubbard's indemnitors makes intervention necessary. The indemnity obligation arises from contracts between intervenors and the Church of Scientology International and Scientology Missions International. Under those contracts intervenors must indemnify Hubbard from all claims against him which arise from their practice of Scientology. The contracts were executed in July and September, 1982, after many of the events of which plaintiff complains had occurred. However, each claim for relief refers to events in October, 1982, or later, so we will assume that intervenors may be required to indemnify Hubbard for at least some of plaintiff's alleged damages. The indemnity agreements give intervenors a sufficient interest in the matter in litigation that the court would not have erred by permitting them to intervene. *See Barendrecht v. Clark*, [244 Or at 528]. Whether the court's denial of intervention was beyond its discretion depends on whether intervenors would be prejudiced in defending against Hubbard's demand for indemnity if they are not allowed to intervene. If they would not, the court's action was permissible."

71 Or App at 489. *See also Hansen v. Johnson*, 143 Or 532, 539, 23 P2d 333 (1933) (surety had sufficient interest in litigation to be made a party). It follows that the indemnity obligations that the physicians would owe defendant if it were to

suffer an adverse judgment in this action as a result of their negligence are sufficient interests to qualify for permissive intervention under ORCP 33 C.

■■ The question remains whether the trial court failed to properly exercise its discretion by denying intervention in the circumstances of this case. In considering that question, we take into account both the prejudice or undue delay, if any, that intervention would cause with respect to the adjudication of rights between plaintiff and defendant, ORCP 33 C, and the prejudice that denial of intervention would cause to the physicians' interests. *Samuels*, 71 Or App at 489.

Insofar as the interests of the original parties to the action are concerned, intervention would visit no prejudice on defendant. In fact, for the reasons that plaintiff has identified, intervention would benefit defendant. However, the situation is different for plaintiff. First, with respect to delay, any delay in setting the case for trial obviously works (indeed, has worked) some prejudice against plaintiff's interest in an expeditious resolution of her claim. However, we cannot say, given the procedural history of this case, that the physicians unduly delayed filing their motions to intervene. Before plaintiff decided to amend her complaint to include specifications of negligence against Robinson, Anderson's counsel was managing the defense of the case based on a tender of defense, and there was no reason for either physician to seek intervention. It was only when the complaint was amended, in mid-December 2008, that Robinson's alleged negligence was implicated, and it no longer made practical sense for one of the physicians' attorneys to manage the defense of the case. The motions to intervene were filed within 60 days thereafter. We are not prepared to say that the physicians unduly delayed the proceedings in that regard. Moreover, the record shows that, if the motions to intervene had been allowed, any additional delay owing to the physicians' joinder would have been relatively brief. Accordingly, under the circumstances, intervention would not have occasioned undue delay in the adjudication of plaintiff's claim.

That said, there is more to prejudice than time. Plaintiff, as do all plaintiffs in civil actions, had a presumptive right to choose her opponents in this action. Of course,

defendant had a limited right to inject new claims in the case by filing a third-party complaint for indemnity against either or both of the physicians within 90 days after service of the original summons and complaint. *See* ORCP 22 C. However, as discussed, defendant deliberately eschewed that option for its own reasons, not the least of which was to avoid the appearance of being at odds with the physicians. Under those circumstances, if intervention were allowed, there would be no claims in this case that would either adjudicate the physicians' liability, if any, to plaintiff or their liability toward defendant for indemnity.

In short, rather than actually resolve the contingent liabilities about which defendant and the physicians express concern, the physicians' presence as intervenors aligned with defendant in resisting plaintiff's claims would risk confusing the jury with such concerns, even though those contingent liabilities would not be adjudicated in this action. In addition, plaintiff, having chosen a single opponent with whom to duel, would be beset by three separate opponents asserting the same (or different) defenses, presenting separate arguments, examining and cross-examining the same and additional witnesses and, in general, complicating the process of the case, both before and during trial. To ignore that kind of prejudice would overlook the prerogative by which plaintiffs routinely evaluate and assume the risks and benefits of naming too many or too few defendants at the outset of an action. In sum, we conclude that the prejudice that intervention would cause to plaintiff's interests supports the trial court's decision to deny intervention. The question remains whether any countervailing prejudice that denying intervention would cause to the physicians' interests is sufficient to conclude that the trial court improperly exercised its discretion by doing so.

We have already answered that question in part. It is apparent from the absence of a third-party complaint in this case that intervention would not accomplish the physicians' goal of efficiently resolving their respective contingent liabilities toward defendant. Nor would it permit the adjudication of cross-claims between them because there are no claims in this action that could result in a judgment against either of them. *See* ORCP 22 B(1) (limiting qualifying cross-claims to defendants "between whom a separate judgment

might be had in the action"). Accordingly, the issue of prejudice to the physicians reduces to one straightforward query: are their interests sufficiently aligned with defendant's interests so as to avoid the risk of unfair prejudice to the physicians' interests?

Again, *Samuels* provides a useful perspective. In that case, we concluded that,

> "[i]f intervenors are not permitted to intervene, Hubbard may refuse to defend the case or may do so inadequately. Intervenors express particular concern that he may not raise their ecclesiastical defenses. However, under California law, which governs the interpretation of the agreements according to their express terms, intervenors can control Hubbard's defense to the extent that the issues involve their indemnity liability. If they do not, they will have a defense to any indemnity claim Hubbard may bring against them.
>
> "* * * * *
>
> "If Hubbard appears in this case, intervenors on his behalf may raise all the defenses that they could raise if they were parties. If he does not appear and does not permit intervenors to appear for him, they may have a defense to his indemnification claim. Although the trial court could have allowed intervention, its refusal to do so does not so damage intervenors that it was an abuse of the court's discretion."

71 Or App at 490-91. Our conclusion in *Samuels* that the trial court had not erred in denying intervention hinged, in part, on our conclusion that, under controlling California law, the churches were entitled to control the litigation if Hubbard were to appear and defend and, thus, their preferred defenses could be asserted. That circumstance does not exist in this case. However, two other significant factors weigh against intervention in this case. First, here, unlike in *Samuels*, the named defendant has appeared and has vigorously defended against plaintiff's claims. Defendant here can prevail only if a jury finds that neither of the physicians was negligent in any of the ways alleged in the amended complaint. By all accounts, defendant must defend the case accordingly. Thus, unlike in *Samuels*, defendant here is

highly motivated to avoid the entry of a judgment against it based on the physicians' alleged negligence.

Second, even though defendant's counsel expressed appropriate concern about the complications posed by the differing deposition testimony of the physicians in this case, that perceived conflict logically should have little, if anything, to do with the defense of this case. Both physicians testified that, regardless of how it was reached, the decision to send the decedent home from the emergency room was not negligent. Whether it was a joint decision or one that Robinson believed ultimately belonged to Anderson, neither physician believed it to be wrong. Plaintiff, who has alleged that the physicians acted in concert, has no interest in exploiting differences between the physicians' testimony about who made the discharge decision. Nor, for that matter, should the physicians or defendant logically wish to emphasize that difference in this case. And, in the end, because there are no claims in this case that would permit the adjudication of liability between the physicians, this case furnishes no opportunity to conclusively determine whether the discharge decision was joint or Anderson's alone. It follows that, even if not perfectly aligned, the interests of defendant and the physicians in defeating plaintiff's claims are sufficiently similar to militate against the risk of unfair prejudice to the physicians' interests in this action.

To summarize: the physicians' indemnity obligations toward defendant are sufficient legal interests to qualify for permissive intervention under ORCP 33 C. However, the trial court nevertheless properly exercised its discretion to deny intervention, because (1) the prejudice to plaintiff's interests that would result from the physicians' intervention is significant, whereas (2) denial of intervention would not unfairly prejudice the physicians, because (a) their intervention would not result in the final adjudication of claims between and among the physicians and the original parties and (b) even though defendant does not represent the physicians' interests in this action, defendant is highly motivated to vigorously defend against plaintiff's claims in order to

avoid the entry of a judgment against it based on the physicians' alleged negligence. That practical alignment of interests militates against the risk of unfair prejudice to the physicians' interests in this action.

Affirmed.